(No. 22526.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN BAIN *et al.* Plaintiffs in Error.

*Opinion filed February 15, 1935—Rehearing denied April 3, 1935.*

SHAW, J., specially concurring.

HARRY OLSON, SANFORD OLSON, and JOHN H. ROGERS, for plaintiffs in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, JOHN T. GALLAGHER, and EDWIN J. RABER, of counsel,) for the People.

458

Per CURIAM: John Bain, his sons, John H. Bain and Robert A. Bain, his son-in-law, W. Merle Fisher, and Frank A. Mulholland and Walter H. Buhlig, were jointly indicted in the criminal court of Cook county for conspiracy. The defendants were arraigned and pleaded not guilty. Mulholland and Buhlig were granted a severance and on the trial testified in behalf of the prosecution. The defendants were allowed to withdraw their pleas and made a motion to quash the indictment, which was overruled. They then filed a motion, supported by affidavit, praying for a bill of particulars. Although no order was entered on this motion a bill of particulars was furnished them. Thereafter the defendants renewed their pleas of not guilty and waived a trial by jury. The court found them not guilty as to the twenty-seventh to the fiftieth counts, inclusive, charging conspiracy to receive deposits when they knew twelve banks designated in those counts to be insolvent, and guilty as charged in the remaining forty-nine counts of the indictment. The court sentenced John Bain to from one to five years' imprisonment in the penitentiary, and fined John H. Bain, Robert A. Bain and W. Merle Fisher $1000 each. Upon a writ of error the Appellate Court for the First District affirmed the judgment. Subsequently the defendants prosecuted a writ of error from this court, and the record is submitted for a further review.

The indictment consists of seventy-three counts. Of these, the first charges the defendants with conspiracy to wrongfully obtain by false pretenses $13,000,000 in money from the public generally, contrary to the statute. The sum specified was the approximate amount of the aggregate deposits of the banks named in the indictment on June 9, 1931. The second count makes the same charges as being "contrary to the law." The third count charges the defendants with conspiracy to unlawfully obtain money and property in the sum of $3,000,000 from the stockholders, depositors, customers and creditors, and persons about

to become such, of the West Englewood Trust and Savings Bank by false pretenses, contrary to the statute. This amount represented the aggregate par value of the stocks of the banks on the day previously named. By counts 4 to 14, inclusive, substantially the same charges are made as in the third count, except the Chicago Lawn State Bank, the Stony Island State Savings Bank, the West Highland State Bank, the Chatham State Bank, the Auburn Park Trust and Savings Bank, the West Lawn Trust and Savings Bank, the Armitage State Bank, the Ridge State Bank, the Brainerd State Bank, the Elston State Bank and the Bryn Mawr State Bank, respectively, are named in the successive counts in the place of the West Englewood Trust and Savings Bank. The fifteenth count charges that John Bain was, and had been for a long time, the president and a director of the West Englewood Trust and Savings Bank; that John H. Bain was, and had been, an officer of the bank and an assistant of the president, performing certain powers and duties as president; that W. Merle Fisher was, and had been, the cashier and a director of the bank, and that Buhlig was, and had been, a director of the bank and the chairman of its discount and finance committee. It is further charged that the defendants unlawfully conspired to buy, discount and purchase, or cause to be bought, discounted and purchased, for and on behalf of the bank, from the defendants, and from firms and corporations which they controlled or in which they were interested, notes, real estate mortgages and real property at exorbitant, extortionate and excessive prices, and to thereby defraud the bank, contrary to the law. Although this count charges that Robert A. Bain and Mulholland conspired as officers and agents of the bank, there is no allegation that either held any official connection with the bank. The sixteenth to the twenty-sixth counts, inclusive, are the same as the fifteenth, except the eleven other banks previously named, respectively, are named in the respective counts in the place of the West

Englewood Trust and Savings Bank. In no one of these eleven counts is it alleged that all of the defendants were connected with the bank in question. The fifty-first count charges the defendants with conspiracy, some as officers of the West Englewood Trust and Savings Bank and others individually, to cheat and defraud the bank and to induce it to make excessive unsecured loans to persons insolvent or approaching insolvency, and to make or cause to be made to themselves, as officers and agents of the bank, or to companies in which they were interested, excessive loans when they or the companies were insolvent, and thereby to injure and defraud the bank of its funds, money and property, contrary to the law. Charges similar to those in the fifty-first count are made in the fifty-second to the sixty-second counts, inclusive, except the eleven other banks, respectively, are named in the place of the West Englewood Trust and Savings Bank. The sixty-third count charges certain named defendants, as officers and agents of the West Englewood Trust and Savings Bank, with conspiracy to procure fraudulent, bad and desperate loans to be made by the West Englewood Trust and Savings Bank to its officers or salaried employees without first having the loans approved, as to either amount or security, by the board of directors of the bank. Counts 64 to 73, inclusive, make charges similar to those in the sixty-third count, except that ten of the eleven other banks, respectively, are named in these counts in the place of the West Englewood Trust and Savings Bank.

It will be observed that the forty-nine counts upon which the defendants were found guilty fall into three groups, the first consisting of the first fourteen counts; the second, counts 15 to 26, inclusive, and also counts 51 to 62, inclusive; and the third, counts 63 to 73, inclusive.

The record is voluminous, consisting of more than 10,000 pages and the abstract more than 800 pages. More than one hundred witnesses testified for the prosecution.

Each of the defendants testified in his own behalf and more than seventy witnesses testified for them. The bill of particulars charged conspiracy with respect to numerous real estate bond issues, trusts and corporations other than the banks named in the indictment. From the evidence it appears that John Bain entered the banking business in 1906 and for six years thereafter conducted a private bank. It was incorporated as the West Englewood Trust and Savings Bank in 1912. Nine years later he participated in organizing the Chicago Lawn State Bank. The Stony Island State Savings Bank was taken over by a group of business men in the vicinity of that bank in 1923. During the same year, Bain, together with a group of local business men, organized the West Highland State Bank. In 1925 the Chatham State Bank and the Auburn Park Trust and Savings Bank were taken over by two different local groups. The West Lawn Trust and Savings Bank was organized by a group of local business men in 1927. The following year the Armitage State Bank was taken over by a group of local business men, and the Ridge State Bank was organized by another group. The Brainerd State Bank was also organized in 1928. In 1929 the Elston State Bank and the Bryn Mawr State Bank were taken over by groups of local business men. The affairs of each of these twelve banks were managed by a board of directors ranging from eleven directors of the Auburn Park Trust and Savings Bank to twenty-one for the West Englewood Trust and Savings Bank. The four defendants were not all members of the board of any one of the twelve banks nor did they own a majority of the stock of a single bank. Of the four defendants only John Bain was a director of each bank. W. Merle Fisher, his son-in-law, was a member of the directorate of four banks, John H. Bain, a son, of five, and Robert A. Bain, another son, of two. The total number of individuals serving as directors of the various banks was 117. Each of these twelve banks vol-

untarily closed on June 9, 1931. In October, 1929, the aggregate deposits of the twelve banks was approximately $28,000,000. Heavy withdrawals during the remainder of 1929, the succeeding year, the first five months of 1930 and in the week preceding the closing of the banks, reduced the total deposits to approximately $12,800,000 on June 9, 1931. On that day the capital, surplus, undivided profits and reserves of the banks amounted to about $6,500,000. As the deposits declined different classes of loans would exceed the requirements of the Auditor of Public Accounts, especially real estate bonds and mortgages. According to the testimony adduced it became necessary for the twelve banks in question to reduce such accounts. To that end John H. Bain called upon and explained to the managers of the respective real estate departments the necessity of calling in some bonds and exchanging others in their place. In like manner where a bank held part of a mortgage he pointed out the advisability of effecting exchanges.

For many years prior to and including 1929 the erection of buildings in Chicago and elsewhere was financed by the sale of real estate bond issues. At the time the various buildings specified in the bill of particulars were erected, the districts in which they were located were rapidly developing and real estate values increasing. The buildings were generally located on corners at street 'intersections. John Bain's interest in the various properties was represented principally by equities. His individual fortune consisted principally of shares of stock in the twelve banks, representing an investment of approximately $1,500,000, and equities in real estate upon which others held prior liens. To summarize the testimony with respect to each bond issue concerning which evidence was adduced would unduly lengthen this opinion. Illustrative of the procedure followed generally is the Normandy Hall transaction. The prosecution asserts that it substantiates every count in the indictment, as a portion of the bond issue was purchased by

each bank, and that the banks thereafter sold the bonds to the public by false pretenses.

The evidence discloses that in 1925 John Bain purchased a parcel of land located at the northeast corner of Seventy-ninth street and Evans avenue—125 feet on Seventy-ninth street and 100 feet on Evans avenue—for approximately $125,000. Subsequently he sold 75 feet to the Chatham State Bank, located one block east of the land in question, for $109,000. In 1926 he sold the remaining 50 feet to Samuel D. Sidell, from whom he received more than $20,000 in money and a first mortgage for $65,000. Bain promised to re-purchase the land from Sidell at a profit of $10,000 if the latter did not sell it within a year. During the same year he re-purchased from the bank the 75 feet for $156,000. Of this sum he paid $20,000 in money, assumed a first mortgage of $29,000, and executed a second mortgage for $107,000. He also re-purchased the 50 feet previously sold to Sidell, pursuant to the agreement mentioned. In the summer of 1928 Buhlig purchased a one-half interest in the entire parcel for approximately $56,000, subject to the first mortgages of $29,000 and $65,000 on the respective portions of the land and the second mortgage of $107,000 on one part. In the early part of 1929 Buhlig and Bain caused to be erected on the premises a three-story building, consisting of eleven stores and twenty-eight apartments, at a cost of $206,420.31. Appraisals were made by Mulholland, James Ryan and Frank McGarr. They fixed the value of the land at $507,000 and the building at $260,000. Edward D. Barry, a witness for the prosecution, testified that he was formerly employed as assistant cashier of the Chatham State Bank and also in the real estate and the savings department of that bank, and that he furnished the data from which to make the appraisals on the Normandy Hall building. Circulars were distributed to the various banks in which it was stated that a conservative estimate of the value of the property was

$633,000. Each of the twelve banks purchased a portion of this bond issue and in turn sold it to the general public. In 1930, after John Bain, Inc., was organized, Buhlig and Bain conveyed their equity in the building to John Bain, Inc., and received in payment stock of that corporation calculated on the basis of $20 per share. The gross rent from this building for 1930 was $24,201.65. Expenses amounted to $6778.55, bond interest $22,325 and taxes $2520. The first interest coupons due June 15, 1929, and the succeeding ones due December 15, 1929, June 15 and December 15, 1930, were paid. Those payable June 15, 1931, six days after the banks closed, were not paid. Only two of the six defendants named in the indictment, Bain and Buhlig, were connected with this controverted transaction. Fisher, John H. and Robert A. Bain had no part in the financing of the Normandy Hall building.

Another real estate bond issue specified in the bill of particulars and relied upon by the prosecution to sustain the judgment will be analyzed. The Standard Sash and Door Company was engaged in millwork and the manufacture of sashes and doors and its profits were dependent upon the condition of the building trades. Its capital stock consisted of 2000 shares, each having a par value of $50. Of these, Arthur H. Olson, and John A. Olson, his brother, owned more than 1600, John Bain 100, W. Merle Fisher 100, and other individuals the remaining shares. Prior to 1925 the net profits of the corporation were large, being $70,000 in 1922, $170,000 in 1923 and $110,000 in 1924. Substantial dividends were paid on the stock in 1924 and 1925. The company transacted its banking business with the West Englewood Trust and Savings Bank, enjoyed a good banking record and was considered the bank's best customer. In 1925 Arthur H. Olson obtained from his attorney a plan for the purchase of the entire interest of John A. Olson in the business of the Standard Sash and Door Company. To effect the purchase a bond issue of

$225,000 was issued against the land and buildings owned by the corporation. Of the proceeds, part was employed to pay a mortgage of $45,000 on the property and the balance was distributed to the stockholders in dividends, each receiving his *pro rata* share. Adding his dividends to the sum of $105,000 which he borrowed from the bank, Arthur H. Olson consummated the purchase of his brother's stock for $250,000. His personal loan of $105,000 was secured by 1619 shares of stock of the Standard Sash and Door Company. On the day the West Englewood Trust and Savings Bank closed, this loan had been reduced to $35,000 and the bonded indebtedness to $205,000, and neither debt was in default either as to principal or interest. The evidence disclosed that John H. and Robert A. Bain had no interest in or any connection with this transaction.

Although the evidence discloses that default in the payment of principal and interest occurred on many of the bond issues named in the bill of particulars following the closing of the banks, it also appears that other bond issues and mortgages made by the banks were paid at their maturity dates. George Barnard, an attorney, prepared a record of the bond issues and first and second mortgages which were paid when due by three of the banks, namely, the West Englewood Trust and Savings Bank, the Chicago Lawn State Bank and the Stony Island State Savings Bank. From this evidence it appears that from 1924 to the day the banks closed, bond issues and mortgages made and paid by the West Englewood Trust and Savings Bank aggregated $2,883,018.88, by the Chicago Lawn State Bank during the same period, $3,514,640, and by the Stony Island State Savings Bank for a period of more than ten years prior to June 9, 1931, $2,310,058.14.

Two of the thirty-eight trusts in controversy are those denominated Trust 687 of the West Englewood Trust and Savings Bank, and the Esplin trust. More than seven years before the Bain banks closed, namely, March 15, 1924,

John Bain created a collateral trust agreement with the West Englewood Trust and Savings Bank as trustee. Pursuant to the terms of that document Bain deposited titles to real estate and stocks with the bank and against this collateral borrowed $500,000, due and payable on May 27, 1934. The agreement provided that as Bain paid the notes property might be withdrawn from the trust. On December 20, 1930, he paid off and surrendered $90,900 of the collateral notes, leaving a balance outstanding of $409,100. Owing to the reduction of the indebtedness, Kerbs, a trust officer of the bank, re-conveyed to Bain two parcels of real estate held as collateral under the trust agreement. Leslie B. Stark, a witness for the prosecution, testified that on June 9, 1931, the total value of the stocks in the trust was $155,479.96, the total cost of the properties conveyed into the trust $461,142.36, and of those remaining in the trust, $208,831.31. Neither John H. nor Robert A. Bain participated in the creation of or had any interest in this trust.

From the evidence it appears that Annie Esplin obtained $40,000 in money from the proceeds of certain insurance policies on the life of her brother; that Robert Esplin, her husband, was a customer of the West Englewood Trust and Savings Bank; that in February, 1931, both at the bank and at the residence of Esplin, he and Fisher discussed the creation of a trust; that in early March Esplin advised Fisher that Mrs. Esplin desired to so invest the money that she would receive a monthly income; that Fisher directed Seaborg, the managing officer of the real estate loan department, to make a selection of securities in conformity with Esplin's request, and instructed Jennings, a trust officer, to prepare a trust agreement embodying the features desired by Mrs. Esplin. Three successive drafts of an agreement were prepared by Jennings. The second was submitted to Esplin. He and his wife directed that it be changed in some minor particulars, and the third draft was mailed to him on March 10, 1931, together with a list

of securities. Fisher also supplied him with a duplicate list of the securities, in order that Esplin might exhibit it to the attorneys for Armour & Co., by whom his brother-in-law had been employed, as he desired to obtain their approval of both the trust agreement and the securities constituting the *corpus* of the trust. Fisher, it appears, submitted a list of the bonds purchased for the trust to John Bain and requested him to examine the list and confer with Mrs. Esplin. On March 17, 1931, he did confer with her at the bank for ten or fifteen minutes. No one else was present at the conference. A few days later Mrs. Esplin executed the trust agreement. · None of the securities placed in this trust were in default as to either principal or interest when placed in the trust or on the day the West Englewood Trust and Savings Bank closed its doors. The prosecution condemns the placing of various securities in this trust, particularly $4800 of Chicago Lawn building bonds.

Recourse to the evidence relating to the above bond issue discloses that in 1930 John Bain, Inc., purchased the title to the Chicago Lawn building, a store, office and theatre building, from the administrator of the estate of one McElroy, subject to an unpaid balance on a first mortgage of $262,500 and a second mortgage of $80,000. Subsequently John Bain, Inc., conveyed the title to the Chicago Title and Trust Company, as trustee, for the purpose of re-financing the property, and John Bain, Inc., underwrote a new bond issue of $375,000 for the purpose of calling in and exchanging the old first mortgage bonds and retiring the second mortgage. The West Englewood Trust and Savings Bank was made escrowee for the exchange of bonds. Some of the new bonds were sold, including $4800 to the Esplin trust. On June 9, 1931, all but $139,000 of the old first mortgage bonds had been exchanged and canceled and all of the second mortgage notes had been exchanged for bonds of the new issue. The evidence

shows that the method pursued was the customary method of handling the re-financing of bond issues of this character and that the closing of the bank prevented its completion. It clearly appears that neither John H. nor Robert A. Bain was in any way connected with either the creation of the Esplin trust or with the specific bond issue assailed.

The bank loans made to the defendants are cited by the prosecution as further evidence of conspiracy. Referring to Robert A. Bain, the record shows that he borrowed $70,000 from the Harris Trust and Savings Bank in 1927 and pledged as collateral 400 shares of the stock of the Stony Island State Savings Bank. By 1929 he had reduced this indebtedness to $52,500. He borrowed sufficient funds from certain Bain banks and the Continental Illinois Bank and Trust Company to pay the loan at the Harris Trust and Savings Bank. On June 9, 1931, these loans had been reduced to $45,554.47, $9900 of which he owed to the Chatham State Bank, $14,089.47 to the Chicago Lawn State Bank, $8950 to the West Lawn Trust and Savings Bank and $12,615 to the Continental Illinois Bank and Trust Company. He did not owe any other of the Bain banks. The loans at the Bain banks were secured by shares of the Stony Island State Savings Bank stock and other collateral. In only one of the banks to which he was indebted was he a stockholder, namely, the Chatham State Bank, owning two of its shares, and in none was he an officer, director or employee. At the time the banks closed Robert A. Bain owned 300 shares of the Stony Island State Savings Bank stock, 35 of the Bryn Mawr State Bank, two of the Armitage State Bank, 40 of the West Englewood Trust and Savings Bank and two of the Chatham State Bank, at an aggregate original cost of $79,720, and various other securities.

W. Merle Fisher on June 9, 1931, owed four of the twelve Bain banks approximately $40,000 and the Continental Illinois Bank and Trust Company $127,000. His

notes held by the Bain banks, as those of Robert A. Bain, were secured by bank stocks and other securities. Similarly his loans had been materially reduced from the amounts originally borrowed. John H. Bain in like manner owed the Bain banks $71,318.33 on the day they closed. At that time he owned securities, principally bank stocks, for which he had paid $195,153, and his investments in real estate equities aggregated $37,583.

John Bain owed the Bain banks $487,296.25 when they closed, and on the same day he owed other banks the aggregate sum of $1,145,881.07. Of the latter sum approximately $925,000 represented his indebtedness to the Continental Illinois Bank and Trust Company. He owed smaller sums to the Chase National Bank, the Omaha National Bank and the Foreman National Bank of Chicago. The bank last named did not open its doors on June 8, 1931, (the day prior to the closing of the Bain banks,) and its deposit liabilities were assumed by another bank in Chicago. It is asserted, and Bain testified, that prior to the closing of the Foreman National Bank he had an open line of credit with the Continental Illinois Bank and Trust Company of $1,300,000. His property statement was on file with that bank and with other large banks. It further appears from the evidence that Bain decreased his indebtedness to the banks during the year immediately preceding June 9, 1931. On the same day, in 1930, he owed approximately $2,309,150 to banks. Of this sum he owed $381,650 to the Bain banks and $1,927,500 to other banks. During that year he had thus effected a reduction of approximately $675,000, or more than twenty-five per cent of his bank indebtedness. Many of his loans at the Bain banks were unsecured.

The Chicago Clearing House is a voluntary association of Chicago banks, for convenience in exchange of checks and supervision. The views of this association, represented by its appraisals made at its own expense, differed from

those of John Bain. The prosecution devotes much attention to its reports of the condition of the twelve banks, but we do not deem them relevant to this inquiry, as the trial court expressly held that the defendants were not guilty of conspiracy to receive deposits knowing the banks to be insolvent. It sufficiently appears, however, that many of the loans criticised by the association were old loans which had been approved by the Auditor of Public Accounts.

Numerous grounds to obtain a reversal of the judgment of conviction are assigned. The defendants first contend that each count of the indictment charged a separate conspiracy covering a span of ten years and a different subject matter, and that the indictment overwhelmed them, and that it was unfair. To sustain their contention they argue that the offense of conspiracy is a felony, and that therefore the rule against joining several distinct felonies in the same indictment is applicable. Section 5 of division 2 of the Criminal Code defines a felony as an offense punishable with death or by imprisonment in the penitentiary. (Cahill's Stat. 1933, p. 1068; Smith's Stat. 1933, p. 1081.) By section 6 of the same division every other offense has been declared to be a misdemeanor. Section 46 of division 1 of the Criminal Code provides that if two or more persons conspire or agree together to obtain money or other property by false pretenses they shall be deemed guilty of a conspiracy, and that every such offender, and also every person convicted of conspiracy at common law, shall be imprisoned in the penitentiary not exceeding five years or fined not exceeding $2000, or both. When an offense may be punished by imprisonment in the penitentiary, or by fine only, or by incarceration in the penitentiary and by fine, in the discretion of the court or jury, the offense, under the statute, is not a felony but a misdemeanor. (*People* v. *Mangano,* 354 Ill. 329; *People* v. *Siemen,* 351 id. 433; *People* v. *Pointer,* 348 id. 277; *People* v. *Anderson,* 342 id. 290; *People* v. *Stavrakas,* 335 id. 570; *Thomas*

v. *People,* 113 id. 531.) It may be observed that the punishment fixed for three of the defendants is a fine while that for only one is imprisonment in the penitentiary. Each count of the indictment charged the defendants with a conspiracy, either in violation of the statute or at common law. It is illegal at common law to obtain money or property or to cheat and defraud by means of false pretenses, (2 Bishop on Crim. Law, (9th ed.) chap. 10; *People* v. *Smith,* 239 Ill. 91;) and the Criminal Code of this State makes it a criminal offense for two or more persons to conspire or agree together to obtain money or other property by false pretenses. If it be conceded that the various counts charge separate and distinct misdemeanors they are nevertheless of the same character or grade. In the case of misdemeanors, several offenses of the same character may be joined in a single indictment under various counts. (*People* v. *Allen,* 352 Ill. 262; *People* v. *Montgares,* 347 id. 562; *People* v. *Elliott,* 272 id. 592.) The law does not require the false pretenses, overt acts or the other means by which a conspiracy was to be carried into execution to be set out in an indictment charging conspiracy to obtain money by false pretenses with intent to cheat and defraud. (*People* v. *Nall,* 242 Ill. 284; *People* v. *Smith, supra; Thomas* v. *People, supra; Johnson* v. *People,* 22 Ill. 314.) Furthermore, the specification of specific grounds in their written motion to quash the indictment operated as a waiver of any and all other grounds which might have been but were not assigned as reasons for quashing it. (*People* v. *Fox,* 346 Ill. 374.) If the defendants deemed themselves perplexed and prejudiced by many charges, their proper remedy was by motion to quash. Although they did file a motion to quash and assigned in it numerous grounds, they did not allege that a multiplicity of counts rendered it impossible to prepare for trial. By failing to move to quash the indictment because the number of charges overwhelmed them the de-

fendants are in no position to complain. 1 Bishop on Crim. Proc. (3d ed.) secs. 424, 425; 1 Wharton on Crim. Proc. (10th ed.) sec. 344; *Hamilton* v. *People,* 29 Mich. 173.

The defendants contend that the trial court erred in not requiring the prosecution to file an adequate bill of particulars; that neither the indictment nor the bill of particulars sets out any false pretenses which any one or all of the defendants conspired to make, and that the prosecution was therefore limited in its proof as to false pretense by its bill of particulars. The prosecution filed a bill of particulars in the present case. The defendants did not complain of the bill furnished them. They neither moved for a more specific bill of particulars nor for an additional bill and the cause proceeded to trial. If they were not sufficiently informed by it they should have demanded a more specific bill of particulars. (*People* v. *Rogers,* 324 Ill. 224; *People* v. *Depew,* 237 id. 574.) Furthermore, a motion for a bill of particulars is addressed to the sound discretion of the trial court. (*People* v. *Munday,* 280 Ill. 32; *People* v. *Nall, supra.*) Only where it is made to appear that the defendant cannot properly prepare his defense without a bill of particulars will the court require the prosecution to furnish one. (*People* v. *Petrilli,* 344 Ill. 416; *People* v. *Nall, supra; People* v. *Smith, supra; DuBois* v. *People,* 200 Ill. 157.) The object of a bill of particulars is to give the defendant notice of the specific charges against him and to inform him of the particular transactions in question, so that he may be prepared to make his defense. (*People* v. *Depew, supra; Cooke* v. *People,* 231 Ill. 9; *McDonald* v. *People,* 126 id. 150.) Its effect, therefore, is to limit the evidence to the transactions set out in the bill of particulars. The prosecution, however, is not required to specify in the bill all the evidence it will produce in support of the charges. The object of such a bill is not to make a substantive charge against the defendant but to restrict the evidence which may be

introduced under the indictment to the particular trans-
actions. The indictment, which is the charge, can neither
be helped nor hurt by the bill.

Prior to the commencement of the trial Bain made a
motion to suppress the evidence relating to certain of his
personal books, papers, records and documents. His mo-
tion was supported by his own affidavit and also that of
James J. Gammonley, his former book-keeper. An an-
swer and a counter-affidavit were interposed to this mo-
tion. A hearing was had on the motion, the affidavits and
the answer. Gammonley and Edward C. Barry were called
as witnesses by the prosecution. No witnesses were called
by defendants. From the affidavits and the evidence it ap-
pears that prior to November 3, 1931, there was pending
in the circuit court of Cook county a chancery proceeding
wherein John W. Seaborg was the complainant and John
Bain, Inc., the defendant; that a hearing was in progress
before Hon. Michael Feinberg, one of the judges of that
court, on the receiver's petition to require former officers,
employees and other persons connected with John Bain, Inc.,
to appear and give testimony for the purpose of discover-
ing assets of the corporation. On the day named, Bain
testified as a witness before Judge Feinberg, and in the
course of his examination he was interrogated about a sub-
scription which it was alleged he had made to the capital
stock of John Bain, Inc. He answered that all of his per-
sonal records were in the possession of Gammonley. The
latter had been Bain's private book-keeper for approxi-
mately eighteen years prior to July 31, 1931, and after
that day he retained possession of his former employer's
books and papers at his office, located at 1536 West Sixty-
third street. The particular papers had been in his posses-
sion about three and one-half years. Bain expressed his
willingness to have Gammonley bring the records into court
and suggested that he be subpoenaed. Barry and Robert A.
Bain informed Gammonley that Bain had instructed them

to notify him to take the books to Judge Feinberg's court room. Gammonley appeared there with the books on the next day but he was not asked to produce them. Later he was served with a *subpœna duces tecum* to produce the records in the circuit court on the 9th day of November. About this time he was served with a subpœna issued out of the District Court of the United States to produce the same records at the internal revenue department in Chicago on November 9, 1931. Following the receipt of these subpœnas Gammonley sought the advice of Bain, who was then confined in a hospital, and the latter directed him to comply with both subpœnas and to coöperate with the courts in every manner possible. Thereafter Gammonley appeared before Judge Feinberg on November 10 and 11 and testified several times. In the course of his examination the presiding judge ordered him to repair to his office, obtain certain other books, papers and records and bring them to the court room. In obedience to this command he produced Bain's canceled ledger sheets, the journal, two cash books and two ledgers. He left the various documents with the minute clerk and upon the trial judge's direction received a receipt therefor from the assistant secretary of the Straus National Bank and Trust Company, the receiver for John Bain, Inc. The receiver permitted the special State's attorney to examine these records and gave him the right to have temporary custody of them. These documents were introduced in evidence at the trial.

John Bain, one of the defendants, contends that his constitutional rights against unlawful search and seizure of his property and against self-incrimination were invaded by forcing him to produce his private books and records, and that it was error to deny his motion to suppress the evidence. On the contrary, the prosecution maintains that there was no seizure of any of his books or records and that what was produced Bain produced voluntarily; that the documents were not in Bain's possession but in the

possession of Gammonley, and that the latter was legally bound to produce them. It will be observed that these books were produced voluntarily at a hearing in a civil suit in the circuit court, which was without jurisdiction in criminal cases, and in a cause instituted several months prior to the return of the indictment in the present case. While in the possession of that court, or of the Straus National Bank and Trust Company, as the court's receiver of John Bain, Inc., the special assistant State's attorney was allowed to, and did, examine the books and records in question. If books, documents, papers or other property belonging to and in the possession of a party who is a defendant in a criminal case be taken by an unlawful search and seizure they may not be introduced in evidence against him upon the trial of the case, and prior to the trial a motion to suppress this evidence so obtained should be granted. (*People* v. *Brooks,* 340 Ill. 74; *People* v. *Winn,* 324 id. 428; *People* v. *Castree,* 311 id. 392; *People* v. *Brocamp,* 307 id. 448.) The constitutional provisions invoked by the defendant apply, however, only to unreasonable searches and seizures. (*People* v. *Reid,* 336 Ill. 421.) A similar contention was presented for decision in *People* v. *Paisley,* 288 Ill. 310. In the course of the opinion this court said: "The court properly permitted the books of all three of the defendants' banks to be used in evidence. \* \* \* \* These books were secured by the State's attorney's office from the receiver in bankruptcy, who had gotten them from defendants' receiver appointed on their bill. Consequently section 10 of article 2 of our constitution, providing 'no person shall be compelled in any criminal case to give evidence against himself,' was not violated. (*People* v. *Hartenbower,* 283 Ill. 591.) The rule is the same in this respect whether the bankruptcy proceedings are voluntary or involuntary. Defendants were not compelled by the court to produce books or papers in their possession, and the cases of *Lamson* v. *Boyden,* 160 Ill. 613,

and *Manning* v. *Mercantile Security Co.* 242 id. 584, are not in point." The record in the present case wholly fails to show an unlawful search and seizure of John Bain's books and records, or an unlawful use thereof in evidence, within the contemplation of the constitutional guaranties on which he relies. The motion to suppress was therefore properly denied.

Numerous objections to the admission of evidence were made by the defendants. Sixty-six specific instances are assigned where the offers clearly showed on their face that the proffered testimony was not admissible against one or more of the defendants. The trial judge admitted the evidence on the promise of the prosecution to connect the other defendants therewith. The prosecution did not, however, connect the other defendants with it. It is true, as the prosecution asserts, that the trial judge in a conspiracy case is vested with much discretion and should have every fact that bears upon the ultimate facts charged and that will assist in reaching a conclusion as to such ultimate facts. (*People* v. *Nall, supra; Spies* v. *People,* 122 Ill. 1; *Williams* v. *People,* 54 id. 422.) If competent evidence clearly justifies a conviction in a criminal case, the admission of incompetent testimony will not be reversible error if it appears that such testimony could not have reasonably affected the result. (*People* v. *Nall, supra; Jennings* v. *People,* 189 Ill. 320.) It cannot be said that the admission of the evidence to which these sixty-six objections were directed was not prejudicial to one or more of the defendants in each case. In the aggregate the admission was clearly harmful to the four defendants.

To obtain a reversal the defendants further contend that the prosecution failed to show that all of them participated in any conspiracy or in all the conspiracies charged in the indictment, and insist that the transactions in controversy were made in the regular course of business, without criminal intent. Conspiracy is generally defined as a

confederacy of two or more persons to accomplish some unlawful purpose or a lawful purpose by some unlawful means. (2 Bishop on Crim. Law, (9th ed.) sec. 175; *People* v. *Bain,* 358 Ill. 177.) To constitute a conspiracy under the statute there must be a concert of will and endeavor on the part of two or more persons to commit an unlawful act. The existence of a conspiracy may be proved not only by direct evidence, but also by inference from conduct, statements, documents and facts and circumstances which disclose a common design on the part of the accused persons and others to act together in pursuance of a common criminal purpose. (*People* v. *Nusbaum,* 326 Ill. 518; *People* v. *Looney,* 324 id. 375; *People* v. *Nall, supra; Tedford* v. *People,* 219 Ill. 23; *Spies* v. *People, supra.*) When a conspiracy is established every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as an act binding all. (*People* v. *Nusbaum, supra; People* v. *Looney, supra.*) All the steps by which the crime was brought about, including every act of each of the conspirators in furtherance of the common purpose, may be shown. (*People* v. *Halpin,* 276 Ill. 363; *People* v. *Hedge,* 284 id. 513; *People* v. *Looney, supra; Spies* v. *People, supra.*) Mere knowledge, acquiescence, approval or attempt, however, on the part of one to perpetrate the illegal act, does not constitute conspiracy. (2 Bishop on Crim. Law, (9th ed.) sec. 190; *People* v. *Bain, supra; Evans* v. *People,* 90 Ill. 384.) In order to convict the defendants of the offenses charged by the first fourteen counts of the indictment the prosecution was required to prove, beyond a reasonable doubt, not only the receipt of the deposits by the defendants, as officers of the banks, with the intention of defrauding the depositors and obtaining for themselves the amount of the deposits and the amount of the capital stock of the respective banks, but it was required further to prove, beyond all reasonable doubt, that such attempts were the result of the union of the wills

and a concert of action for that purpose on the part of the defendants. To obtain a conviction on the second group of counts, and on the third group of counts heretofore analyzed, it was essential to prove a like union of the wills and a concert of action on the part of the defendants.

From the evidence it appears that others than the defendants were connected with each transaction and that in no instance did the transactions occur at the same time. Nor did they cover the same subject matter and involve the same persons. The evidence fails to show that any representations and promises were made in bad faith and without reasonable prospects of performance when made. Although it appears from the record that after a building was erected the value of the improved real estate was in many instances estimated at a sum in excess of the original cost of the land and the actual cost incurred in the erection of the building, the prosecution has failed to prove that such estimates were a part of a conspiracy to obtain money by false pretenses. Many honest-minded persons had illusory ideas of realty values during the period of these transactions as viewed by what has subsequently transpired. The various transactions were independent and separable. Proof is wanting that the defendants acted with unity of design and purpose. Even if it be conceded that the defendants individually performed questionable or illegal acts, unless these acts were pursuant to a mutual agreement, the concession cannot avail the prosecution. To sustain the judgment the prosecution argues that there is only one conspiracy, namely, the operation of twelve banks, and that, in consequence, the subject matter is one—not several. It has previously been observed that only one of the defendants was officially connected with each bank. The evidence fails to show that the four defendants conspired with respect to the affairs of any of the banks or the bond issues and trusts in controversy. It is argued that the exchange of bonds and mortgages in 1931 shows a conspir-

acy to defraud, and that there was a concerted plan to exchange defaulted bonds and mortgages for those not in default. The evidence fails, however, to disclose the confederacy or where this was done. In any event, it appears that neither Fisher nor Robert A. Bain participated in the procedure attacked.

To sustain the charge of conspiracy with respect to the Normandy Hall transaction, the prosecution contends that the total cost of the ground and building was $297,000. To reach this figure it maintains that the cost of the land must be taken at the 1925 cost, asserted to be $125,000, and the cost of the building at $172,000, the cost exclusive of financing commissions, insurance, etc. According to Bain's calculations the total cost of the land and improvements was $499,329.01, counting the cost of the land at $292,908.70 and the cost of the building at $206,420.31. There is no proof that the value of the land, improved in 1929 with the Normandy Hall building, coincided with its value as vacant property in 1925. It sufficiently appears that the equity of Bain and Buhlig in this property was substantial.

Both the appraisals used and the appraisers selected by the defendants are criticised. The prosecution asserts that the only testimony in the record that has any evidentiary value with respect to the buildings on which the questioned bond issues were floated is that of Harry S. Cutmore, a construction engineer. He made appraisals of twenty-six of the buildings, setting forth what the cost of construction would have been at the time the bond issues were made and what the cost of reproduction would have been on June 9, 1931. In estimating his values he used a chart of values of the county assessor's office employed for determining reproduction costs. This opinion testimony cannot avail the prosecution, for it was clearly incompetent. In the recent case of *People* v. *Stevens,* 358 Ill. 391, we had occasion to refer to like testimony introduced by the prosecution in

that case, as follows: "In civil cases the rule is that fair cash market value of property on the date under inquiry is its value for the highest and best use for which it is adapted, and evidence tending to show profits from the operation or volume of business, or contingencies of future profits, are too speculative and remote to be considered. (Citing cases.) The method by which the witness Hornof arrived at his conclusion as to the value also included the use of a chart which he found in the assessor's office. Assessed value of land is incompetent in determining market value.—*Lewis* v. *Englewood Elevated Railroad Co.* 223 Ill. 223; *American State Bank* v. *Butts,* 111 Wash. 612, 17 L. R. A. 170; 22 Corpus Juris, 178." The judgment of the appraisers, when viewed in the light of subsequent events, was erroneous. While the figures may seem excessive and indicate bad judgment, the evidence fails to disclose that dishonest appraisals were made or that any of the defendants either desired or sought false appraisals.

When the bonds defaulted, the interest of John Bain in the various properties was dissipated prior to the losses sustained by the depositors of the banks or the bondholders. Conceding, as the prosecution asserts, that these equities were without market value on June 9, 1931, and that the value of many of the bond issues placed against the properties had depreciated, it does not follow that the loans on the properties were excessive when obtained. · It is a matter of common knowledge that real estate values and the market values of real estate mortgages declined precipitately during the years immediately following the collapse of security values in late 1929. In this catastrophic melting away of market values both the conservative liens and those deemed not conservative declined. This situation, obviously, was not confined to bond issues sponsored by one or more of the defendants nor to the territory in which the properties were situated. The decline in values was extensive, being not only national but international in its

scope. The question is, therefore, not whether the purchasers of securities on buildings in which one or more of the defendants were interested experienced declines in the value of their bonds during a period of universal calamity and panic, but, rather, did Bain and the other defendants conspire to and make fraudulent representations to the purchasers of the value of the properties at the time they sold the bonds.

While the loans to the defendants may be criticised, and even condemned, they have not been shown to have been made pursuant to a confederacy to defraud by false pretenses. Robert A. Bain, John H. Bain and W. Merle Fisher, the two sons and the son-in-law of John Bain, had on file at each bank where they were borrowers sworn property statements of their assets, liabilities and net worth. The loans to them were made with the approval of a majority vote of the directors of the respective banks. Moreover, no one of them, or all of them collectively, (including John Bain,) controlled the banks making the loans, either through stock ownership or in representation on the boards of directors. It appears that each of their loans was secured when made and remained so until the day the banks closed; nor is there any evidence that the soundness of these loans was ever challenged by the Auditor of Public Accounts.

The judgments of the Appellate Court and the criminal court of Cook county are reversed and the cause is remanded to the criminal court. *Reversed and remanded.*

Mr. JUSTICE SHAW, specially concurring: I agree with the result reached in this opinion but not with all that is said therein.