(No. 23433.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK J. LINK *et al.* Plaintiffs in Error.

*Opinion filed October 14, 1936—Rehearing denied Feb. 9, 1937.*

268

John L. McInerney, (Bernhardt Frank, of counsel,) for plaintiffs in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and A. B. Dennis, (Edward E. Wilson, and Henry E. Seyfarth, of counsel,) for the People.

Mr. Justice Wilson delivered the opinion of the court:

Frank J. Link, John T. Miller, Timothy J. Crowe, August W. Miller, Timothy L. Connolly, James M. Whalen, John J. Touhy, John K. Lawler and Martin Edelstein were jointly indicted in the criminal court of Cook county for conspiracy. Of these, Crowe was president of the board of trustees of the Sanitary District of Chicago in 1927 and 1928, Link, August W. Miller, Whalen, Touhy and Lawler were trustees, John T. Miller was superintendent of the department of permanent plants and structures, Edelstein was head of the real estate department and Connolly

was the purchasing agent. Connolly was not apprehended until the trial was in progress, and the charge against him was subsequently *nolle prossed*. The other defendants pleaded not guilty and waived a trial by jury. Lawler died during the trial. August W. Miller, Whalen and Touhy were acquitted, and Link, John T. Miller, Crowe and Edelstein were found guilty as charged. The court sentenced Link and Crowe to from one to five years' imprisonment in the penitentiary, and fined John T. Miller and Edelstein each $2000 and sentenced them to confinement in the house of correction for six and three months, respectively. Thereafter the court sustained a motion to vacate the sentence against Edelstein and the indictment was *nolle prossed* as to him. Upon a writ of error the Appellate Court for the First District affirmed the judgment against Link and John T. Miller. Crowe died during the pendency of the writ, and it was, in consequence, abated as to him. The defendants, Link and John T. Miller, have prosecuted a writ of error from this court and the record is submitted for a further review.

Prior to the commencement of the trial all counts of the indictment except the first, third and seventh were quashed. The first charges the nine persons previously named with conspiracy to wrongfully obtain, by false pretenses, $5,000,000 in money from the Sanitary District of Chicago. The third count charges the defendants with conspiracy to unlawfully divert $3,000,000 in money and property from the Sanitary District of Chicago to certain persons by inducing the sanitary district to pay to such persons large sums of money under the false pretenses that they were performing, and had performed, work, services and labor for the district and that it was indebted to them, when, in fact, they were not performing and had not performed any services, work and labor for the district and it was not indebted to them. By the seventh count the charge is made that the defendants conspired together and

with George L. Chamberlain, and with divers other persons whose names were unknown, to award certain contracts at an extortionate cost to the Sanitary District of Chicago, namely, for work and labor to be done in the construction and equipment, among others, of the West Side sewage treatment works, the North Side sewage treatment works, a cinder path and bridle path, and the ornamental electric street lighting system of McCormick boulevard, and thereby to defraud the district of its funds.

The record is voluminous, consisting of approximately 7000 pages and the abstract of more than 1300 pages. More than 700 witnesses testified for the prosecution. None of the defendants testified in their own behalf and only one witness was called by them. The actions of the defendants upon which the charge of conspiracy rests fall into three major classifications: (1) Pay-roll padding; (2) the unauthorized construction of a cinder or bridle path at an exorbitant cost to the Sanitary District of Chicago; and (3) not only excessive but also duplicate, and in some instances multiple, payments for services and materials furnished the district by various companies. The evidence with respect to these matters will be summarized.

During the period in controversy Crowe was president of the Sanitary District of Chicago and Link was one of the trustees. On December 2, 1926, the board of trustees adopted a rule which provided that "the committee on employment shall appoint all employees of the district, and the chairman of said committee shall certify in writing to the head of the proper department and to the clerk the names of all such employees, stating the positions to be filled and the compensation to be paid to such employees. Thereupon it shall be the duty of such head of department and the clerk of the district to include the name of such employee upon the pay-roll of the district. * * * The head of any department, in case of emergency, may temporarily employ such agents and employees as may be required by the work

of the district and report his action in the premises at once to the committee on employment." Crowe was chairman of the committee on employment during 1927 and 1928 and the other trustees were members. The board, in one meeting in 1927 and in another in 1928, approved the employment of all persons placed on the pay-rolls in those two years. The sanitary district had several departments, among others, law, permanent plants and structures, purchasing, engineering, and Illinois valley. The defendant John T. Miller was the head of the department of permanent plants and structures. This department, in turn, had several divisions, one of which was the water-meter survey division. Two hundred ninety-one witnesses testified that although their names were on the water survey pay-roll they performed no services whatever for the sanitary district. They received in the aggregate many thousands of dollars in "pay." The committee on employment approved the appointment of these persons and placed them on the pay-roll upon receiving an authorization from Miller as to each individual. Among them was J. A. Egelston, sponsored by Link, who testified that he received $200 per month from April 1 to November 15, 1928. This witness admitted not only that he performed no services for the district but also that he never reported for service. Charles Young, a musician, was on the water survey pay-roll during October and November, 1928. He testified that he was engaged to sing at political meetings, and that he learned that he was on the pay-roll of the sanitary district only when he was compensated in the form of checks issued by the district.

One hundred sixty-two other persons testified that they were on the water survey pay-roll and performed services wholly incommensurate with their remuneration. Large salaries were paid to these witnesses for services such as copying names off poll and registration lists, addressing envelopes, and interviewing certain householders to ascertain

whether they had water meters in their houses. One to four hours a day was devoted to these purposes. During election periods, however, the witnesses spent from two to four weeks of intensive effort in purely political activities in their local neighborhoods. Illustrative is the case of a minister of the African Methodist-Episcopal Church. He stated that he was on the pay-roll of the sanitary district from January to November, 1928, at a salary of $200 per month. For services described as follows he received $2000: "Was assigned to survey the water from Thirty-ninth street and the lake front to Randolph. I used to go up and down and report, walking along the lake front. Had an instrument to survey it with. . I would say whether the water was raised or fell, whether the water was higher, and went down, and report. I made those reports to the clerk, verbal reports. I would report that the lake level mark was about six to eight inches difference, as the case appeared, day after day. That was the only work I ever did for the district—the only work that I was ever asked to do. * * * The ex-State's attorney Crowe gave me a letter to Timothy Crowe." Fred Spoffard was on the water survey pay-roll from January 1 to June 30, 1928, and again from October 1 to November 30. He testified that he performed a little clerical work for two or three days at the office of the district; that he was then sent to the county building to copy some names on long sheets of paper, and that he received $1406.25 in compensation. Referring particularly to his employment from January 1 to June 30 Spoffard said: "I think I worked the first three days, and did no work after that." The evidence also shows that eighty-one persons admitted they were employees of the law department who rendered no service to the district, and that twenty-nine others testified that they were on the same pay-roll and performed but slight services. A glaring case is that of one witness who was on this pay-roll for sixteen months, namely, from August, 1927, until November, 1928, at a

monthly salary of $625. He received $10,000 for such services as he himself described: "On one case I put in a total of about ten days. I did some other·work preparing. All together I should say I put in about thirty or forty days. That is all the work I did for the district."

The Illinois valley department had charge of actions brought against the district to recover for alleged damage to lands and crops caused by the overflowing of the Illinois river, which was claimed to have been caused by the negligence of the district in regulating the flow of water. Twenty-five persons, denominated "investigators," testified that they were on the Illinois valley pay-roll, with expense accounts, and did either no work or rendered negligible services for the district. They received large salaries for little or no work, and, in addition, submitted false expense accounts. One Schaeffer testified that he received $5000 in salary, at the rate of $250 per month, and $1448 for expenses. He admitted that he never performed any services whatever for the district. William Lass, sponsored by Link, typifies those who rendered perfunctory services. He was in the employ of the district from November 15, 1927, to December, 1930, at a salary of $300 per month. He received $1961.70 for unincurred expenses in 1928. Vouchers therefor purported to be expenses in connection with trips to Beardstown. The witness stated, however, that he never made a single trip to that city. The record also shows that a substantial number of persons occupying official positions were placed on the law pay-roll of the district. Although they testified that they received pay in large amounts, few performed any· service whatever.

Additional facts and circumstances connect the defendants with the pay-roll padding. Twelve persons who did no work for the sanitary district were directed by Link to report to their ward committeemen and do political work. A. J. Link, a brother of one of the defendants, testified that he was on the law pay-roll from June 1, 1927, to No-

vember 15, 1928, and received $300 per month, but that he never did any work for the district. Lawrence J. Mc-Donnell, a waiter at the Brevoort Hotel, was on the pay-roll of the sanitary district although he did not seek such a position and did not know that his name was on the pay-roll until late in 1929. He testified that two checks payable to his order and bearing his purported endorsement were not signed by him. His wife was a precinct captain in Link's ward. When Mrs. McDonnell learned that her husband's name appeared on the pay-roll she called upon Link and sought payment of the checks. According to her testimony Link told her that sometimes his secretaries made personal advances for which they were reimbursed by deducting such sums from the sanitary district checks to its employees. A hand-writing expert testified that one of the checks made out to Lawrence McDonnell bore the endorsement of Frank J. Link in his genuine handwriting.

A bridle path was constructed by the sanitary district, beginning at Winnemac Park in Chicago and extending to West Railroad avenue in Evanston, following the course of the North Shore channel. Miller discussed the building of the path with various trustees. The Sanitary District of Chicago was organized under the act entitled "An act to create sanitary districts and to remove obstructions in the DesPlaines and Illinois rivers." Section 11 as amended (State Bar Stat. 1935, p. 1383; Smith-Hurd Stat. 1935, p. 1367;) provides: "All contracts for work to be done by such municipality, the expense of which will exceed five hundred dollars, shall be let to the lowest responsible bidder therefor upon not less than ten days' public notice of the terms and conditions upon which the contract is to be let having been given by publication in a newspaper of general circulation published in said district." All but three vouchers for the project were in amounts less than $500. The trial court held that while the method of payment for the work and materials by such vouchers constituted no offense,

the fact that payments were so made was a circumstance in the proof of the conspiracy to obtain the money of the sanitary district by false pretenses. The record discloses that the total cost of the bridle path was $1,068,861.91, as follows: Cinders—85,886 yards at $1.90 a yard, $162,866.50; auto trucks hired, $291,175.90; teams hired, $7712.50; rental of equipment, $131,490.50; repairs to rented equipment, $8458.75; pay-rolls, $265,683.35; materials, equipment and expense, $201,474.41. Competent engineers computed the entire reasonable cost of construction of the bridle path at $292,375.08. Most of the cinders used in the bridle path were furnished by Frenzel Bros., who operated under that name and also as the Chicago Grading Company. Charles J. Frenzel, one of the partners, testified that Connolly, the purchasing agent of the sanitary district, advised him to bill the cinders as sold by two different companies, in order that it would not look so "fishy." The company obtained cinders from various industrial plants. It also appears that Frenzel Bros. received thirty-eight cars of cinders from the Thirty-ninth street pumping station of the sanitary district without cost, and that they later sold these same cinders to the district. In short, the sanitary district, through its trustees, gave cinders to Frenzel Bros. and then bought the same cinders back from them. Moreover, the evidence shows that Frenzel Bros. charged the district prices exceeding the prevailing market price for cinders.

Evidence concerning over-charges and duplicate payments is itself voluminous. Employees of the district working under Miller, and others, organized the City Machine and Engineering Company. Desk space was rented in an insurance and real estate office at 3953 Roosevelt road. George Pezman, a machinist, entered the employ of the company in 1926. His duties consisted of repairing pumps and engines and doing general machinist work for the sanitary district. He testified that he was a foreman and hired

union men to assist him; that he worked for the company part of 1926, all of 1927 and part of 1928, and that he received pay checks for himself and his subordinates from the district. In particular, he testified that he worked for seven or eight days at the Glenview pumping station, where he and two other men overhauled two pumps; that he, with three or four assistants, worked for three or four weeks at the Ninety-fifth street pumping station overhauling a hydraulic gauge and a sewer pump; that he and two others worked for three or four days at Northbrook overhauling sewer pumps; that he and two machinists worked for seven or eight days at Morton Grove on a gasoline engine and sewer pump; that he and two other machinists worked a week at the Clifton avenue pumping station; that he and two other men worked a week at the Wilmette pumping station hanging a chain hoist and trolleys; that he and three other men worked two or three weeks at Elmwood, and that he and three or four others worked for three months at the Lawrence avenue pumping station overhauling the steam turbine engines and pumps. For the work set forth, and for like services, the City Machine and Engineering Company received $168,000 from the sanitary district.

An experienced engineer, who himself had done business with the district from its inception and was thoroughly familiar with the character of the work done by the company for the district, testified that the reasonable price for the repairs made at the Lawrence avenue pumping station was $4310. The amount invoiced and paid was $9056—an overcharge of nearly $4800. The witness testified further that the invoice price for the repairs at the Clifton avenue pumping station was $976.62 and the reasonable price was $600, or an overcharge of $376.62; that the reasonable price for the work at the Ninety-fifth street pumping station was $1580 against an invoice of $3249.11, or an overcharge of $1669.11; that the invoice for the Thirty-ninth street pumping station was $1808.91 and the reasonable

price $1000, or an overcharge of $808.91; that the charge for the Morton Grove pumping station was $360.45 and the reasonable price $200, or an overcharge of $160.45; that the invoice for the Glenview pumping station was $2313.55 and the reasonable price $1285, or an overcharge of $1028.55; that the invoice for the Elmwood pumping station was $2931.45 and the reasonable price $1556, or an overcharge of $1375.45; that the invoice price for the Northbrook pumping station was $2421.85 and the reasonable price $1150, or an overcharge of $1271.85; that the invoice price of the DesPlaines treatment plant was $11,641.04 and the reasonable price $5907, or an overcharge of $5734.04, and that the invoice price for the Calumet pumping station was $9417.48 and the reasonable price $5477, or an overcharge of $3940.48. This testimony stands uncontroverted. By stipulation it was agreed that the City Machine and Engineering Company submitted bills to the sanitary district and the district in turn issued its vouchers for bills aggregating $80,558.34 in 1927 and $47,691.94 in 1928—a total of $128,250.28.

The Evers-Sauvage Engineering Company furnished labor and material on machinery of the sanitary district under the supervision of the defendant John T. Miller. It received therefor $54,240.35 from the district in 1927 and 1928. Walter Doud, an engineer formerly employed by the district, testified with respect to the repair of four motors for the pumps at the Wilmette station, and $10,099.25 was paid by the district to the Evers-Sauvage Company for this work in the form of twenty-two vouchers dated October 13, 1928. The motors in question were, however, actually repaired by the General Electric Company at a cost of $5560.73, which was charged by it to the Evers-Sauvage Company. Other evidence with respect to this company discloses that work at various plants and stations of the district was invoiced at and paid for by sums far in excess of the reasonable price therefor.

Evidence similar to that set forth concerning the Evers-Sauvage Company was introduced concerning the so-called Dietrich companies, the Davis Sales Company, the Fallon Company, the Mid-West Supply Company, the Leah-Jack Company, the Federal Insulation Company and O. S. Bach, a carpenter.

The record discloses further that in many instances duplicate, triplicate and even quadruplicate payments were made for materials purchased and services rendered through Miller's department and under his control and supervision. The orders for the payment of the same were authorized by Miller. It was stipulated upon the trial that the trustees of the sanitary district approved the vouchers for the payment of the salaries of all those on the pay-rolls and for all work done or alleged to have been done. Thomas J. Whalen, the committee reporter and secretary for the sanitary district during 1927 and 1928, testified that the voucher lists were considered by the finance committee and then by the board of trustees; that the chairman (Crowe) would present the lists to the entire board and inquire if there was any objection; that the witness could not recall a single instance of an objection being interposed by any of the nine members of the finance committee or discussion relating to the payment of these vouchers, and that upon the roll-calls all trustees present from time to time voted for their payment.

The salaries of trustees of the sanitary district are fixed by statute at not more than $7500 per annum. (State Bar Stat. 1935, sec. 4, p. 1371; Smith-Hurd Stat. 1935, sec. 4, p. 1355.) Miller's salary as superintendent of the department of public plants and structures was $12,000 per year. Subject to the objections of the defendants, a report of investigation as to credits in the form of deposits at certain banks during 1927 and 1928 was admitted in evidence. From this exhibit it appears that $99,100 in currency was credited to the bank accounts of Link and his wife, begin-

ning with February 1, 1927, and ending October 4, 1928. Likewise, deposits of currency aggregating $103,265.42 were made in Miller's name during the period commencing July 16, 1927, and ending October 11, 1928. In addition, the liabilities ledger account of Miller at one bank showed a demand loan of $50,000 made February 1, 1928, and paid four weeks later in currency. At another bank, a loan of $70,000 made on April 13, 1928, and paid June 7, 1928, in currency, and a loan of $90,000 on June 9, 1928, and paid September 7, 1928, with $88,000 in currency and $2000 by check.

To obtain a reversal, Link and John T. Miller make the contention, among others, that the first, third and seventh counts of the indictment are fatally duplicitous. They argue that each of these counts charges that it is for the same act and offense charged in a previous indictment. Each count charges that the alleged conspiracy was entered into on December 6, 1928. From the record it appears that the defendants had on May 29, 1930, been indicted for the same offenses as those charged in the present indictment, returned June 5, 1931. All counts in the earlier indictment were either quashed or *nolle prossed*. The indictment now attacked recites in each count that the defendants are indicted on the same charge as is made in the indictment returned May 29, 1930. Section 6 of division 4 of the Criminal Code provides that when an indictment is quashed or the proceedings on the same are set aside or reversed on writ of error the time during the pendency of such indictment shall not be reckoned so as to bar any new indictment for the same offense. (State Bar Stat. 1935, p. 1246; Smith-Hurd Stat. 1935, p. 1217.) The manifest purpose of the allegations assailed was to toll the Statute of Limitations. (*Swalley* v. *People,* 116 Ill. 247.) Duplicity in an indictment has been defined as the joinder of two or more distinct offenses in the same count of an indictment. (Joyce on Indictments, sec. 392.) The word "same," em-

ployed in the indictment returned June 5, 1931, applies only to the corresponding charge contained in the first indictment, returned May 29, 1930. The allegations as to the former indictment and that the respective counts of the indictment which the defendants challenge are the same as those contained in the first indictment refer solely to the tolling of the Statute of Limitations. The counts upon which the convictions rest are not duplicitous.

The seventh count, which charges that the defendants conspired with George L. Chamberlain, and with divers other persons whose names are unknown, it is urged, should have been quashed because the named conspirators are not the same as in the other counts. This contention rests upon the theory that Chamberlain was designated a co-conspirator. He was not, however, made a defendant. Persons engaged in a conspiracy are not a part of the offense to the extent that they are descriptive of it. (*United States* v. *Heitler*, 274 Fed. 401; *People* v. *Smith*, 239 Ill. 91.) Nor does failure to prosecute all the known conspirators prevent the prosecution of a part of them. (*Cohen* v. *United States*, 157 Fed. 651.) Furthermore, the specification in their written motion to quash the indictment of specific grounds, operated as a waiver of any and all other grounds which might have been, but were not, assigned as reasons for quashing it. (*People* v. *Bain*, 359 Ill. 455; *People* v. *Fox*, 346 id. 374.) If the defendants deemed themselves prejudiced because Chamberlain was not named as a defendant their proper remedy was by motion to quash. Although they filed a motion to quash and assigned in it numerous grounds, they did not allege that the failure to name Chamberlain as a co-defendant in any manner prejudiced them. By failing to move to quash the indictment on the ground now urged the defendants are in no position to complain. *People* v. *Bain, supra.*

Counts 1 and 3, it is insisted, are barred by the Statute of Limitations. In prosecutions for conspiracy the Statute

of Limitations does not begin to run from the time the conspiracy was entered into, but, on the other hand, from the commission of the last overt act in furtherance of the conspiracy. (*Cooke* v. *People*, 231 Ill. 9; *Ochs* v. *People*, 124 id. 399.) The original indictment was returned on May 29, 1930, and, as the period of limitation for conspiracy is eighteen months, it was necessary to show that the conspiracy charged continued to exist after November 29, 1928. The evidence shows many overt acts well within the statutory period. On December 6, 1928, the board of trustees in a meeting approved all the acts of its employment committee. Three witnesses, included in the categories previously described, testified that they were on the pay-roll of the sanitary district until December 15, 1928. At least twelve others testified that, even though performing no service, they remained on the pay-roll until November 30, 1928. The defendants do not contend that the matters relating to the contracts in count 7 were barred by the statute. Being admissible under the first count, that testimony, alone, was sufficient to show a conspiracy within the statutory period.

The contention is earnestly argued that the prosecution sought to prove the existence of a number of disconnected, separate, small conspiracies wherefrom to infer the existence of a large general conspiracy. Conspiracy has been defined as a confederacy of two or more persons to accomplish some unlawful purpose or a lawful purpose by some unlawful means. (2 Bishop on Crim. Law, (9th ed.) sec. 175; *People* v. *Bain, supra.*) Section 46 of division 1 of the Criminal Code (State Bar Stat. 1935, p. 1164; Smith-Hurd Stat. 1935, p. 1129;) provides that if two or more persons conspire or agree together to obtain money or other property by false pretenses they shall be deemed guilty of a conspiracy. To constitute a conspiracy under the statute there must be a concert of will and endeavor on the part of two or more persons to commit an unlawful act. The existence of a conspiracy may be proved, however,

not only by direct evidence but also by inference from conduct, statements, documents and facts and circumstances which disclose a common design on the part of the accused persons and others to act together in pursuance of a common criminal purpose. (*People* v. *Bain, supra; People* v. *Drury,* 335 Ill. 539; *People* v. *Looney,* 324 id. 375; *People* v. *Nall,* 242 id. 284; *Tedford* v. *People,* 219 id. 23; *Spies* v. *People,* 122 id. 1.) When a conspiracy is established every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as an act binding all. (*People* v. *Nusbaum,* 326 Ill. 518; *People* v. *Looney, supra; Ochs* v. *People, supra.*) All the steps by which the crime was brought about, including every act of each of the conspirators in furtherance of the common purpose, may be shown. *People* v. *Halpin,* 276 Ill. 363; *People* v. *Looney, supra; Spies* v. *People, supra.*

An analogous situation obtained in *Ochs* v. *People, supra.* The defendants, certain members of the board of county commissioners of Cook county, and other persons, were indicted for conspiracy to obtain money from Cook county by false pretenses. The proof related to occurrences over a period of five years. From the evidence it appeared that a combination was formed among a number of commissioners sufficient to control the awarding of contracts for county expenditures, and auditing and paying the bills for such expenses, and various officials in charge of certain county institutions. The commissioners in question awarded contracts for supplies and work to such persons as would pay commissions and bonuses therefor. The contractors, in turn, rendered false and fraudulent invoices containing over-charges, and the commissioners audited them and approved their payment. The contention was made, as here, that though the evidence might tend to show that there were minor conspiracies among certain ones or groups of the accused, it did not show a general conspiracy in which all the defendants were engaged, and that, what-

ever the conspiracy may have been, it was not the specific one charged in the indictment. In disposing adversely to their contention the court held that a conspiracy may be proved either expressly or by the proof of facts from which the jury may infer it. The court quoted with approval from Archbold's Criminal Pleading and Practice, 619, language to the effect that although it is more desirable to show an intimacy between the defendants charged with conspiring, and private meetings or consultations, it is not essential, as the jury may imply the conspiracy of all from the overt acts of each. The court then quoted from Greenleaf on Evidence (vol. 3, sec. 92,) as follows: "Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design, and to pursue it by common means. If it be proved that the defendants pursued, by their acts, the same object, often by the same means, one performing one part, and another another part of the same, so as to complete it, with a view of the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object." Similarly, in the present case the authorities cited dispose of the point that the proof consisted of disconnected conspiracies and not one general conspiracy. *Allen* v. *United States,* 4 Fed. (2d) 688, and *Ryan* v. *United States,* 216 Fed. 58, are to the same effect as *Ochs* v. *People, supra.* In the case at bar the uncontroverted proof shows that hundreds of persons were placed on the pay-rolls of the sanitary district who performed no services in return for their remuneration, and that the bridle path along McCormick boulevard was constructed at a cost so excessive as to appear staggering in the extreme. The trustees paid all vouchers and approved all pay-rolls without a recorded dissent. These acts, purporting to have been in connection with the affairs of the district, took place in the office of that municipal corporation, and the conclusion

is inescapable that money was fraudulently diverted from it. The defendants, Link and John T. Miller, cannot be permitted, as they attempt, to charge their own misdeeds to Edelstein and Connolly. All materials furnished and services performed with relation to contracts on the various plants, machinery and structures of the sanitary district were approved by Miller, as head of the department of permanent plants and structures, and all vouchers therefor were approved by the trustees, including Link, without a dissent being noted. In addition, the bank accounts of the defendants showed astounding increases in size, owing to amazing deposits of currency. These reflections of soaring income took place while the bridle path was being constructed at an exorbitant price and while not only excessive but also multiple payments for supplies were being made. The evidence clearly showed a union of the wills and a concert of action on the part of the defendants to defraud the Sanitary District of Chicago, as charged in the indictment.

Other contentions relate to the sufficiency of the evidence to sustain the convictions on the respective counts and the admissibility of certain testimony. The defendants assert that the evidence fails to show a pay-roll conspiracy, as charged in the first and third counts. No useful purpose can be served by setting forth the purported extenuating circumstances now pleaded. It suffices to observe that the evidence previously set forth, amply, if not abundantly, proved that both defendants, one an elected officer of municipal government and the other an appointee, participated in the perpetration of a shocking and unconscionable conspiracy to defraud the sanitary district of its money and property by false pretenses, among others, through the medium of pay-roll padding. Hundreds of persons who performed negligible or no services for the sanitary district were placed on the pay-rolls, to the detriment of the tax-payers. Crowe, as chairman of the committee on employment, handled all appointments, and the entire board

approved the employment of all persons in 1927 and 1928. The evidence warranted the conclusion that a principal, if not the major, object of the padding of the water survey pay-roll was to assure the perpetuation of the tenure of the trustees then holding office. Manifestly, the actions of the defendants proclaimed a pay-roll conspiracy.

Evidence to sustain the seventh count, it is contended, is wanting. The seventh count charges a conspiracy to defraud by excessive and exorbitant prices and costs in connection with certain contracts. If two items attacked by the defendants are eliminated from the cost of the bridle path, the cost therefor, according to the testimony of reliable witnesses, would be $1,051,729.24 against a reasonable cost of $292,375.08. Conceding, as the defendants strenuously insist, that evidence to sustain the seventh count is lacking, the concession does not support their contention, as the testimony relating to this count was admissible under the first count. The finding of the court was a general finding of guilty, which, of course, included a finding of guilty under the first count. Where there is a general finding of guilty, one good count sustained by the evidence will support the finding. *People* v. *Darr,* 262 Ill. 202; *Ochs* v. *People, supra.*

The contention is also made that the evidence failed to show the actual cost of the bridle path, and that, therefore, count 7, in charging excessive cost of "divers contracts," is meaningless. The seventh count, in charging a conspiracy to defraud, elaborates upon the first count by setting forth the means to effectuate the conspiracy. It is unnecessary to set out the means by which a conspiracy to do an unlawful act is to be accomplished. (*People* v. *Smith, supra; Chicago, Wilmington and Vermilion Coal Co.* v. *People,* 214 Ill. 421; *Thomas* v. *People,* 113 id. 531.) The bill of exceptions does not contain the bill of particulars filed by the prosecution setting forth the contracts upon which proof was adduced. If the defendants believed the allega-

tion "divers other contracts" failed to inform them sufficiently of the charges to be met they should have requested a more specific bill of particulars. *People* v. *Fox, supra.*

Our attention is directed to portions of the evidence. The defendants argue that the theory of the prosecution was that John T. Miller was a co-conspirator merely because he knew of the existence of a conspiracy and acquiesced therein. Mere knowledge, acquiescence, approval or attempt, it is true, on the part of one to perpetrate the illegal act, does not constitute conspiracy. (2 Bishop on Crim. Law, (9th ed.) sec. 190; *People* v. *Bain, supra,* and 358 Ill. 177; *Evans* v. *People,* 90 id. 384.) The testimony previously narrated shows, however, actual participation in the conspiracy charged and proved.

It is also said that the evidence fails to show that Link was a member of the conspiracy. The testimony shows that numerous so-called pay-roll witnesses were sponsored by Link and that persons placed on the pay-roll by him were specifically ordered to report to that defendant's ward headquarters for strictly political assignments. His brother was placed on the pay-roll of the district and received several thousand dollars for which he rendered no services whatever. Furthermore, McDonnell's testimony tends to indicate that Link obtained the money of the district by diverting funds to himself. Link voted in favor of every pay-roll presented for approval. In addition to approving padded pay-rolls he consented to the payment of the bills heretofore mentioned. Proof that Link was a member of the conspiracy charged is overwhelming.

Complaint is made concerning the admission of testimony with respect to the bank accounts of Miller and Link. They assert that this testimony necessarily resulted in an inference being drawn from an inference, or a presumption from another presumption. The prosecution answers that the deposits were admissible as circumstances tending to prove the principal issue, and that, with other evidence, con-

clusively proved the guilt of the defendants. The large sums deposited from time to time, taken in connection with the amount of salary received, unexplained by the defendants, were facts which, in our opinion, had a pertinent bearing on the question of obtaining the funds of the Sanitary District of Chicago by false pretenses. It all had a bearing on the question of the conspiracy as charged. In *Attorney General* v. *Pelletier*, 240 Mass. 264, the charge, among others, was made that a district attorney conspired with an attorney with whom he had intimate and professional relations, and others, to extort money by threats of criminal prosecution. Considerable evidence was introduced concerning financial transactions of Pelletier and the attorney. This evidence related to withdrawals of large sums of money by the attorney from his bank accounts, or the possession by him or his agents of large sums of currency, and the deposit, soon after, by Pelletier of similar amounts of currency to his credit in his bank account. The sums so deposited by the respondent varied from $1000 to $5000. The Supreme Judicial Court of Massachusetts, in holding that the transactions were competent evidence, observed: "The use of bills in such large amounts rather than checks, in the practice of the law or in the ordinary transactions of life, is so unusual as to arouse suspicion in connection with other circumstances. * * * Of course this evidence standing alone does not prove criminal conduct. But there were strong accompanying circumstances of an independent character tending to show wrongdoing. It is not necessary that every piece of evidence admitted should be sufficient by itself to prove the main fact in issue. 'Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts.'" Likewise, in the present case attendant circumstances of an independent character disclose criminal conduct. Again, the trial court in a conspiracy case is

vested with a large degree of discretion and should have every fact that bears upon the ultimate facts charged and that will assist in reaching a conclusion as to such ultimate facts. (*People* v. *Nall, supra; Williams* v. *People,* 54 Ill. 422.) Since competent evidence clearly justified the judgment of conviction, the admission of the testimony assailed, even if deemed inadmissible, would not constitute reversible error, as it appears that such testimony could not have reasonably affected the result. *People* v. *Gruber,* 362 Ill. 278; *People* v. *Weir,* 295 id. 268; *People* v. *Nall, supra.*

The final contention of the defendants is, that the judgment, sentences and fine against them are void because they were, it is asserted, entered by a branch of the criminal court composed of three judges sitting *en banc.* The *placita* in the record shows that the cause was tried before Hon. Harry .M. Fisher, a judge of the circuit court of Cook county and *ex-officio* judge of the criminal court of Cook county. The common law record recites: "By agreement between State and defendants case submitted to the court for trial without a jury. Present: Hon. Harry M. Fisher, Hon. John Prystalski and Hon. James J. Kelly." And later: "February 5, 1932. Before Hon. Harry M. Fisher, Hon. John Prystalski and Hon. James J. Kelly, sitting *en banc.* Judgment. And the court being fully advised in the premises doth find the said defendants," etc. The bill of exceptions was signed and sealed by Judge Fisher alone. The bill commences: "Be it remembered, that heretofore, to-wit, on the 25th day of November, A. D. 1931, being one of the days of said term of said court, before the Hon. Harry M. Fisher, judge of the circuit court of Cook county, *ex-officio* judge of the criminal court of Cook county, and Judges John Prystalski and James J. Kelly, both judges of the superior court of Cook county and *ex-officio* judges of the criminal court of Cook county, the latter two named judges acting in an advisory capacity."

. Prior to the trial a colloquy ensued between Judge Fisher and an assistant State's attorney and the counsel for

the defendants, in which it was expressly understood and agreed that no objection would be made to the fact that the chief justice of the criminal court, (Judge Fisher,) as presiding judge, was being advised, or that two associate judges of the criminal court were sitting in an advisory capacity. In particular, the assistant State's attorney said: "If the court please, I presume at this time that all of the defendants outside of Mr. Lawler are in court, which has not been true I think before, and I think that each defendant in his own person as well as by counsel ought to waive any objection to the hearing of this case before your honor with two other members of the bench sitting in an advisory capacity, for the purpose of our record." Judge Fisher responded: "They have already done that. Is there any objection to repeating the waiver?" Counsel for the defendants answered: "None at all." The record discloses further that Judge Fisher ruled upon questions of evidence, such as motions to strike various portions of the testimony and the admissibility of the bank accounts of the various defendants. Illustrative is the following excerpt from the bill of exceptions:

"Mr. Northup: That is all. I offer this check in evidence and ask to have it marked State's exhibit Wood [a handwriting expert] No. 1 of this date, the check in question. I offer it in evidence.

"Mr. Fink: I object to it as incompetent, irrelevant and immaterial.

"Judge Prystalski: Let Judge Fisher rule on it.

"Mr. Northup: Sir.

"Judge Prystalski: Let Judge Fisher rule on it. Renew your offer.

"Mr. Fink: Let the record show the objection is overruled and exception.

"Judge Prystalski: I prefer that he make the ruling, because he is sitting."

Even if it be conceded, as the defendants now urge, that the two additional judges sat with Judge Fisher *en banc* as a three-judge court and not merely in an advisory capacity, the concession cannot avail them. The defendants, as recounted, waived any objection to those judges sitting in an advisory capacity and agreed to refrain from urging an objection thereto on review. They interposed no objection in this regard in their motions for a new trial, in arrest of judgment or to vacate the judgments and sentences. Complaint was first made on review in the Appellate Court. Although consent of the parties cannot confer jurisdiction of the subject matter where jurisdiction to entertain a cause is wanting, it does not follow that the parties may not assent to faulty organization of a court. Section 26 of article 6 of the constitution, defining the jurisdiction of the criminal court, and sections 3 and 5 of "An act to revise the law in relation to the criminal court of Cook county," and "An act in relation to the criminal court of Cook county," approved and in force April 21, 1881, (State Bar Stat. 1935, p. 1089; Smith-Hurd Stat. 1935, p. 1037;) invoked by the defendants, neither affirmatively authorize nor expressly prohibit a court or branch thereof consisting of more than one judge.

*Hall* v. *Hamilton*, 74 Ill. 437, is relied upon by both the defendants and the prosecution. In that case the *placita* to the record recited that three judges of the superior court and two of the circuit court of Cook county were present. The action originated in a confession of judgment. The warrant of attorney, among other things, provided that a *cognovit* for the amount due might be filed, with an agreement that no writ of error should be prosecuted or appeal taken and that all errors be released. The *cognovit* as agreed to expressly released all errors. Referring to the composition of the personnel of the trial court this court said: "If that number sat and decided questions, they may have been decided by three of the five, and the decision

different from what it would have been had but one judge sat. Hence such an organization of the court is not such as litigants are entitled to have when their causes are tried. But the court thus organized is not without jurisdiction. Either of the five judges had jurisdiction to try any' and all causes, and the association of the others with him did not detract from or deprive him of the jurisdiction vested in him by the constitution and the statute. The *placita* to all records in that court, and to transcripts to this court, should show that one judge sat on the trial, who it was, and that he was holding a branch court. But being only error, which may be waived or released, plaintiff in error released it with all others by the *cognovit* filed by his attorney in fact." Similarly, in the present case, the court, even if faulty in organization, did not lack jurisdiction. *State v. LeBlond,* 108 Ohio St. 126, and *Sherwood* v. *Stephenson,* 25 Conn. 431, are to the same effect as *Hall* v. *Hamilton, supra.* Obviously, improper organization of a judicial tribunal may be waived. While this procedure is not to be commended or desired yet the criminal court of Cook county had jurisdiction of the subject matter of the particular proceeding and of the parties. The contention that the judgments, sentences and fine are void is without merit.

This cause was tried before the court without a jury. The trial court had the benefit of seeing and hearing the witnesses, of observing their demeanor while testifying, and was far better equipped to pass upon their credibility than is a court of review. The record discloses that the defendants received a fair trial, and we observe that the record is unusually free from error. Upon review the Appellate Court made a careful survey of the evidence and a painstaking analysis of the defendants' contentions and affirmed the judgment of the criminal court.

The judgment of the Appellate Court is right, and it will accordingly be affirmed. *Judgment affirmed.*