THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALAN BRINN *et al.,* Plaintiffs in Error.—(THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALLEN J. CLEMENTS *et al.,* Plaintiffs in Error.)

*Opinion filed January 21, 1965.—Rehearing denied March 17, 1965.*

JULIUS LUCIUS ECHELES, STEPHEN LEVY, MARSHALL SCHWARZBACH, and BELLOWS, BELLOWS & MAGIDSON, all of Chicago, for plaintiffs in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and GEORGE W. KENNEY, Assistant Attorneys General, and ELMER C. KISSANE, MATTHEW J. MORAN, and WILLIAM J. NELLIS, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

On March 25, 1960, a Cook County grand jury returned an indictment charging eight Chicago police officers, Allen

Clements, Alan Brinn, Frank Faraci, Alex Karras, Sol Karras, Peter Beeftink, Henry Mulea, and Patrick Groark with conspiracy to commit burglary and conspiracy to receive stolen property. The indictment contained 18 counts, 14 of which were *nolle prossed* after a criminal court judge sustained a motion to quash the other four counts. The State appealed the order quashing the indictment in part and this court reversed and remanded for trial. *People* v. *Beeftink,* 21 Ill.2d 282.

After remand the defendants proceeded to trial on the four counts. One count charged that they conspired with Richard Morrison and Floyd Wilde on or about October 1, 1958, to commit burglary by forcibly breaking and entering into certain buildings and carrying away property contained therein. Another count alleged the same conspiracy and charged that pursuant thereto, the defendants feloniously entered the premises of Western Tire and Auto Stores, Inc., Self Furniture Co., Firestone Stores, Inc., General Radio and Appliance Store, Danny's Squirrel Lounge, Anderson Marine Sports, and Lee Automotive Supply Co. The other two counts charged the defendants conspired to receive stolen property and alleged that pursuant thereto, the defendants received property rightfully belonging to such establishments.

A bill of particulars was furnished on the first count and specified similar offenses with respect to a Sinclair gas station at 5452 North Clark Street, Stetler's Music Store, and Walgreen's Drug Store at 7510 North Western Avenue.

Prior to trial, all charges against Richard Morrison and Floyd Wilde were *nolle prossed.* Each of the remaining eight defendants was found guilty as charged in the indictment. All were tried by a jury in a joint trial, except Patrick Groark, who had waived trial by jury. Neither Beeftink, Mulea nor Groark have sought review of their convictions. The other five defendants were sentenced to the Illinois State Penitentiary. Brinn received a sentence to 1

to 3 years; Faraci, 2 to 5 years; Clements, 2 to 5 years; Alex Karras, 2 to 5 years; Sol Karras, 2 to 3 years.

On this consolidated appeal the defendants argue that the trial court erred in failing to grant a new trial because of prejudicial publicity. They further argue that the trial court erred in failing to quash search warrants and suppress certain evidence; in failing to grant a severance; and in permitting the jury to set the penalty for the crimes.

In addition to these common claims of error, defendant Clements argues that there was a fatal variance in the indictment as to him; that the court erred in admitting certain evidence as to him; and in denying him sufficient time to prepare post-trial motions.

We first must consider the effect of the publicity surrounding the trial. It is clear that the unfortunate scandal that gave rise to these indictments was the subject of widespread publicity in the press for more than a year prior to the trial.

Defendants were arraigned on February 15, 1961, after the return of the mandate from this court. The cause was set for trial by agreement on May 15 and again reset for June 12, 1961. At that time the defendants moved for a further continuance, and some of the defendants also asked that the cause be transferred to another county because of the prejudice of Cook County residents, although no motion was filed for such change of venue in accordance with the statute. (Ill. Rev. Stat. 1961, chap. 146, pars. 20, 22-24.) Defendant Faraci sought to have the trial judge use his contempt power to control the reporting of the trial.

The trial court denied all the requests of defendants and proceeded with the selection of the jury. For seven days a thorough examination was conducted of prospective jurors with regard to any views they might have due to the reading of newspaper articles. Approximately 180 prospective jurors were examined on the question of the influence of publicity. Eighty were excused for cause by the trial court

upon group inquiries. Twenty-six were excused for reason of the influence of publicity, and the remainder for other causes. One hundred prospective jurors were individually examined by counsel and twenty stated that they at one time formed some opinion as to the guilt or innocence of the defendants, and were excused.

When the last of the twelve jurors was accepted the defendants had twenty peremptory challenges remaining. On the basis of the entire record on *voir dire* examination, we .do not believe that the defendants have shown such a pervasive prejudice created by pretrial publicity that would prevent the selection of an impartial jury. The fact that defendants did not challenge any of the jurors selected is strong evidence that they were convinced that the jurors were impartial and unbiased. *Beck* v. *Washington,* 369 U.S. 541, 8 L. ed. 8d 98.

It therefore follows that the trial judge did not abuse his discretion in denying defendants' pretrial motions in relation to prejudicial publicity.

Defendants also contend that the publicity during the actual trial was prejudicial and deprived them of a fair trial. In support of this argument defendants have pointed out almost daily banner headlines from Chicago newspapers relating to the trial. In addition to the effect of the totality of attendant publicity, defendants point out three specific instances of prejudicial material.

The first instance was a headline appearing after the trial judge had denied defendants' motion for a directed verdict at the close of the State's case. The front page headline stated: "Cop Judge Decides: 'I Can Believe Thief,' Police Lose Acquittal Bid."

The second example was an apparently false front page headline appearing during the trial stating: "Two Cops Offer Guilty Plea."

Further headlines appeared prior to final arguments

quoting Morrison to the effect that "Cops Tried To Kill Me."

The issue of newspaper publicity was raised by almost daily motions for a mistrial, requests that the trial judge exercise supervisory powers over the press, and requests for individual examination of each juror outside the presence of the others. All such requests were denied.

This argument raises the serious problem of the possible conflict between the fundamental right of a free press and a public trial and the equally basic right that the accused should be tried by a fair and impartial jury.

One solution to the problem of eliminating improper influences on jurors during a trial is the complete seclusion of the jury, and we think that the defendants, on the particular facts of this case, had the right to insist on such seclusion. *People* v. *Wilson,* 400 Ill. 603, 610-611; *People* v. *Schneider,* 362 Ill. 478.

At the beginning of the trial counsel for defendant Faraci moved that the jury be locked up, and the State joined in the request. The court took the motion under advisement and asked that it be renewed each day. Thereafter the combined defense counsel elected to have the jury separate and later in the trial defendant Faraci declined to renew his motion for seclusion of the jury even though the trial court advised that such a motion would be granted.

The trial court also admonished the jury at length at the beginning and end of each day of trial as to their duty as jurors to remain free from outside influences and to refrain from reading or viewing matters relating to the trial. In addition the trial judge interrogated the jury each day as to their exposure to external influences, and the jurors repeatedly denied such exposure.

At no time during the trial did the defendants offer any evidence that a juror had seen any of the objectionable headlines.

Prior to final arguments, one of defense counsel requested that defendants' attorneys be permitted to conduct an individual *voir dire* examination of each juror concerning their exposure to news media, and suggested many proposed lines of inquiry. In view of the precautions and interrogations by the trial judge heretofore noted, we do not believe the trial court abused its discretion in refusing to permit the procedure suggested.

We have examined the facts of the cases cited by defendants where mistrials were granted because of prejudicial publicity during trial, and find that there was either clear proof that some of the jurors had read the offending articles (*Marshall* v. *United States,* 360 U.S. 310, 3 L. ed. 2d 1250; *People* v. *Kenzik,* 9 Ill.2d 204; *People* v. *Hryciuk,* 5 Ill.2d 176,), or there was exposure to a prejudicial report and a complete failure to instruct or admonish the jury not to consider anything they may have read about the case. *People* v. *Murawski,* 394 Ill. 236.

In *People* v. *Gambino,* 12 Ill.2d 29, this court affirmed the denial of a motion for a mistrial on the ground of prejudicial publicity, stating at pages 36-37:

"The record before us is devoid of any facts or circumstances from which it is reasonable to infer that any of the jurors read the newspaper accounts in question, except for the bare assertion of defense counsel in the motion for mistrial. Such statement is insufficient to raise the inference that the jurors have seen or read the questioned article or articles. (*People* v. *Harrison,* 384 Ill. 201; *People* v. *Herbert,* 340 Ill. 320.) While the motion alleged that the jurors had access to and read the articles, yet such assertion is not made in the supporting affidavit. Upon this record neither the trial court, nor this court, would be justified in concluding that a juror or jurors read any of the articles. Without such showing there is no reasonable basis for the inference that they were influenced or prejudiced thereby."

In the present case, where there is no evidence in the record that the jurors had read the headlines, and indeed a negative response by the jurors to specific inquiries as to their exposure to such influences, we do not believe that the trial judge erred in believing that the panel was free of prejudice and that the jurors had heeded the court's constant instructions and admonishments. (*Cohen* v. *United States* (9th cir.) 297 F.2d 760, 764.) We therefore conclude that the trial court did not err in denying defendants' motions for mistrial.

Defendants also urge that their post-trial motions to vacate the judgments should have been granted. These motions set forth an article appearing in a local paper the day after verdict, in which a reporter, one Baldwin, quoted an unnamed juror as stating she had commented that Brinn had warned Morrison that some of the others had set up a trap to get him killed. Defendants also moved that the jurors be subpoenaed in order that they might be interrogated concerning the truth of the article.

Although eleven days elapsed between the article and the hearing, the defendants failed to offer any proof, either by witnesses or affidavits, to support the pure hearsay contained in the article.

In view of defendants' failure to make any showing of an attempt to subpoena witnesses, or even to interview them, we can find no error in the trial court denying a motion that it subpoena witnesses and conduct a hearing. In *People* v. *Stacey*, 25 Ill.2d 258, 270, the defendant sought a new trial on the ground that a newspaper article quoted jurors as stating that they were influenced in their verdict by certain improper publicity. We stated at page 270 : "This newspaper article was pure hearsay and was entirely insufficient evidence upon which to contend that the jurors were improperly influenced. It has always been held that the verdict of jurors cannot be impeached even by their own affidavit or testimony. (*People* v. *Pulaski*, 15 Ill.2d 291, 300.) Here,

we do not even have the statements of the jurors themselves, but merely the statement of a newspaper reporter as to what the jurors had told him. This showing was entirely insufficient to establish that the verdict of the jurors was rendered as a result of any improper newspaper publicity."

We adhere to the views expressed in the *Stacey* case and hold the trial court properly denied the motion for a new trial.

We must next consider the contention that the trial court erred in failing to quash search warrants and suppress the evidence of stolen goods found in the residences of the defendants.

All the searches involved were made on January 14, 1960, pursuant to written statements of Richard Morrison and interviews between Morrison and police officials on January 13 and 14, in which he detailed the commission of robberies with the defendants and stated that stolen property could be found in the homes of the defendants. Search warrants were then prepared, and teams of police officers were ordered to the Conrad Hilton Hotel for a meeting. Captain Hackett testified that he told the officers that a man in custody had accused certain police of aiding him in burglaries and in receiving the proceeds. He also told them that they had ten search warrants for the men and that they were to go to the residences of the men at 10:30 and keep the premises as they found them until Chief Newey and Morrison arrived.

Pursuant to these orders the police entered the residences of the defendants and waited until Newey, Morrison and others arrived. The defendants were all taken to a local club and thereafter interrogated.

Because of obvious defects in the search warrants, the trial court held that the search and seizure of the property in question was justified, not on the basis of the search warrants, but on the basis that the searches and

seizures were incident to lawful arrests. On this appeal the State relies on the same reasoning.

It is well settled that defects in a search warrant are immaterial if the search can be otherwise justified. (*Marron* v. *United States,* 275 U.S. 192, 198, 72 L. ed. 231; *United States* v. *Gearhart* (4th cir.) 326 F.2d 412; *United States* v. *Jones* (7th cir.) 204 F.2d 745; cert. den. 346 U.S. 854; *People* v. *McIntyre,* 15 Ill.2d 350.) It is further clear that a reasonable search incident to a lawful arrest is proper. *Harris* v. *United States,* 331 U.S. 145, 150, 91 L. ed. 1399; *People* v. *Fiorito,* 19 Ill.2d 246, 252; *People* v. *La Bostrie,* 14 Ill.2d 617, 621.

As we stated in *People* v. *Fiorito,* 19 Ill.2d 246, 253: "An arrest without a warrant is lawful if a criminal offense has in fact been committed and the arresting officer has reasonable grounds for believing that the person to be arrested has committed it. (Ill. Rev. Stat. 1957, chap. 38, par. 657; *People* v. *La Bostrie,* 14 Ill.2d 617, 621; *People* v. *Boozer,* 12 Ill.2d 184, 187; *Draper* v. *United States,* 358 U.S. 307, 3 L. ed. 2d 327.) Probable cause or reasonable grounds in such a situation means something less than the evidence which would result in conviction. *People* v. *Jones,* 16 Ill.2d 569, 573.

"There is a great difference between that which is required to prove guilt in a criminal case and probable cause for arrest and search, as well as in the tribunals which determine such matters, and therefore, a like difference in the *quanta* and *modes* of proof required to establish such guilt or probable cause. (*Draper* v. *United States,* 358 U.S. 307, 3 L. ed. 2d 327; *Brinegar* v. *United States,* 338 U.S. 160, 93 L. ed. 1879.) Probable cause for arrest exists where the facts and circumstances within the arresting officer's knowledge and of which he had reasonable and trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been

committed and that the person arrested is guilty. *People* v. *Jones,* 16 Ill.2d 569, 574; *People* v. *La Bostrie,* 14 Ill.2d 617, 622."

In the *Fiorito* case we further pointed out at page 255:

"A completely satisfactory determination of what constitutes reasonable cause for arrest by an officer without a warrant is difficult to formulate. The recurring question must be resolved by the facts and circumstances of each case. In deciding the question in a particular case the courts deal with probabilities and are not disposed to be unduly technical. They must act upon 'the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act.' (*United States* v. *Rabinowitz,* 339 U.S. 56, 63, 94 L. ed. 653, 659; *Brinegar* v. *United States,* 338 U.S. 160, 175, 93 L. ed. 2d 1879, 1890; *People* v. *La Bostrie,* 14 Ill.2d 617, 621, 622; *People* v. *Tillman,* 1 Ill.2d 525, 530.)"

From a careful review of the record in this case we think the detailed accusations of Morrison, together with corroborating facts concerning particular robberies, were sufficient to form a basis for a reasonable belief that a felony had been committed and that the defendants had committed it.

It is true that the teams of police officers making the search had not read Morrison's statements and had not talked to him, but the reasonableness of their actions is readily justified by the information submitted to them by their superior.

Defendants further contend that they were not arrested prior to the searches. We have examined the record and find that, despite some lack of verbal precision, there can be no doubt that the defendants were each arrested prior to the questioned searches and seizures. All were detained by the police and thereafter taken to a central place for interrogation and later "booked."

We find that the trial court was correct in refusing to

suppress the evidence since it was obtained by reasonable searches incident to lawful arrests.

We next turn to the argument strongly urged by defendant Clements and joined in by other defendants that the evidence at most proved separate burglaries or separate and distinct conspiracies rather than a single conspiracy involving all of the defendants.

Defendant Clements accepts the traditional rule that the truth of Morrison's accusations against defendants is for the trier of fact (*People* v. *Woods,* 26 Ill.2d 582,), but insists that such accusations do not amount to proof of a single conspiracy.

The evidence shows that Morrison first met Faraci and Brinn in June, 1958, and that in September, Faraci, Brinn and the Karrases had discussions about burglarizing the Western Tire and Auto store. This burglary was accomplished and there is ample evidence that Faraci, Brinn, the Karrases, Mulea and Groark were involved in the incident and shared in the proceeds.

In October, Alex Karras, Faraci and Beeftink discussed and were involved in two burglaries, while Faraci was involved in another of which it is clear that Alex Karras and Beeftink had knowledge.

These operations continued and in November Morrison burglarized the Firestone store after discussions with Faraci, Brinn and Alex Karras. Morrison was arrested as a result of this burglary by other officers of the Summerdale District, and while in jail advised Alex Karras and Faraci to go to his apartment and take the stolen property before his apartment was searched.

Clements first became involved with Morrison in February, 1959, when either Groark or Alex Karras told Clements that Morrison was all right, and had committed burglaries with them. Later that month, Clements informed Morrison that he would commit burglaries with him on days off, but not with other officers in the district, and on March 29,

1959, Clements, Morrison and one Wilde broke into the Squirrel Lounge and the General Radio and Appliance store. On April 10, 1959, Lee Automotive Supply was burglarized while Clements was on duty on a three-wheeler in the area. On April 28, 1959, the Firestone store in the Summerdale district at the corner of Clement's post was broken into a second time, while Brinn, Mulea and Clements were on duty. Morrison was not involved in this burglary, but two television sets and a radio stolen from the store were found in Clements's home on January 14, 1960.

Among the property taken from another burglary was a portable television set, without a back, which Brinn brought to Donato's Repair Service for repairs and a new back in June, 1959. Brinn said the set belonged to Clements, and a receipt for payment was subsequently made out to Clements on October 16, 1959. This television set was also recovered from Clements's home on January 14, 1960.

Conspiracy has been defined as a confederacy of two or more persons to accomplish an unlawful purpose, (*People* v. *Bain,* 359 Ill. 455,) and whether a scheme is one conspiracy or several separate ventures is ordinarily a question of fact. *Hayes* v. *United States* (8th cir.) 329 F.2d 209, 214; *United States* v. *Crosby* (2d cir.) 294 F.2d 928, 945.

We agree with defendant Clements that a coincidental similarity of operation, such as strangers disposing of stolen goods to a single receiver, (*United States* v. *Lekacos* (2d cir.) 151 F.2d 170,) or strangers obtaining different favors by bribes to a single official, (*Canella* v. *United States* (9th cir.) 157 F.2d 470,) does not necessarily involve all in a single conspiracy. *People* v. *Gates,* 29 Ill.2d 586; *Rocha* v. *United States* (9th cir.) 288 F.2d 545.

Nevertheless it is well settled that the existence of a single conspiracy may be proved not only by direct evidence but also by inference from conduct, statements, facts and circumstances which disclose a common design on the part of the accused and others to act in pursuance of a com-

mon criminal purpose. *People* v. *Borrelli,* 392 Ill. 481; *People* v. *Link,* 365 Ill. 266; *Ochs* v. *People,* 124 Ill. 399.

From an examination of this voluminous record we find the conclusion not only permissible but inescapable that all of the defendants entered into a single design, albeit at different times, to use their peculiar position as police officers in the Summerdale district to conduct a wholesale looting of stores in the district. While not all of the defendants took part in every burglary, there is sufficient evidence that they were all well aware of a concerted purpose to protect Morrison and others in his activities and to share in the proceeds. Whether their individual activity was in serving as lookout, picking up the goods, refraining from investigating, or aiding in avoiding detection, we feel that the jury, admittedly properly instructed, could have found defendants guilty of a single conspiracy. *People* v. *Link,* 365 Ill. 266, 286.

We have also examined the contentions of Brinn and the Karras brothers that they were prejudiced by the court's denial of motions for severance. We stated in *People* v. *Grilec,* 2 Ill.2d 538, 546-547: "The general rule is that where one or more defendants are jointly indicted for the commission of a crime, they are to be tried together; and whether a separate trial should be granted is largely within the sound judicial discretion of the trial court. (*People* v. *Barbaro,* 395 Ill. 264; *People* v. *Mutter,* 378 Ill. 216.) The record here discloses not only that the defenses of Grilec and his codefendant Milosic were not antagonistic, but, on the contrary, they were wholly consistent and harmonious. The paramount inquiry or test is, are the defenses of such an antagonistic nature that a severance is imperative to insure a fair trial. We are of the opinion the trial court did not err in denying plaintiff in error's motion for a severance."

The record indicates that the defenses in this case were not basically antagonistic. The only alleged antagonism in-

volves a conflict in part of the various exculpatory statements of the Karras brothers and Brinn. All of the defendants made exculpatory statements after their arrests. In Brinn's statement he indicated that he was in the home of Sol Karras when Morrison was there with merchandise. This statement was introduced into evidence with the names of Morrison and Karras deleted and the jury was properly instructed that it was to be considered only against Brinn. The Karras statements as originally read to the jury made no mention of Brinn, but in rebuttal the deleted statements referring to Brinn were introduced to show contradictions between the trial testimony of the Karras brothers and their pretrial statements.

It appears that the jury was thoroughly and properly instructed as to the limited purpose for which the statements were introduced. We have examined the voluminous report of proceedings and determine that no such antagonism or prejudice was created to require separate trials for the defendants. The trial judge therefore did not abuse his discretion in denying the motions for severance.

Defendant Clements also claims error in the admission into evidence of a radio and two television sets which were found in his home. Clements insisted he had purchased them from Morrison. Evidence adduced by the State was sufficient to show that the items came from a burglary of the Firestone store on April 27 or 28, 1959. This burglary was not encompassed by the indictments or by the bill of particulars. Nevertheless we think that evidence of the possession of this stolen merchandise is admissible to show guilty knowledge on the part of Clements. *People* v. *Fiorito,* 413 Ill. 123, 131; *People* v. *Wagman,* 311 Ill. 330, 336.

Clements also claims he was denied due process of law in that he was not given time to prepare and argue post-trial motions. We find the post-trial motions were argued orally the day after trial upon stipulation of the parties entered into after the State waived the requirement of written post-

trial motions and agreed that defendants should not be prejudiced from raising any issue on appeal except the matter of the time for hearing on the motions. Defendants were not denied either the right to argue motions or to obtain additional time, and in fact were offered two weeks to file written motions. We find they have in no way been prejudiced by the procedure followed.

Finally all defendants earnestly contend that the statute under which they were sentenced (Ill. Rev. Stat. 1961, chap. 38, par. 754a,) was unconstitutional in that it permitted the jury to set the degree of punishment. They first relied chiefly on an unreported opinion of the United States District Court for the Northern District of Illinois ( *United States ex rel. Witherspoon* v. *Ogilvie,* 63 C. 1812), wherein the trial court held the precise statute unconstitutional. Subsequent to the filing of defendants' brief, the Court of Appeals for the Seventh Circuit reversed in *United States ex rel. Witherspoon* v. *Ogilvie,* 337 F.2d 427, 431,) stating: "From our study of the matter we perceive no violation of due process or deprivation of equal protection of law, whether in the classification of offenses Illinois made with respect to whether the court or the jury would fix the punishment following conviction in a jury trial or in the procedure followed in the trial of the petitioner as a result of that classification." A petition for writ of *certiorari* has been docketed in the Supreme Court of the United States on October 17, 1964. *Witherspoon* v. *Ogilvie,* No. 602 Misc.

The argument of defendants was also fully considered by the court in *People* v. *Kolep,* 29 Ill.2d 116, 126, where we stated: "It is urged by defendant that this statute was violative of section 5 of article II of the Illinois constitution. This constitutional provision guarantees to every person charged with crime the right to trial by jury as 'heretofore enjoyed'. Under the common law in force at the time of the adoption of the Illinois constitution the judge and not the jury fixed the sentence in criminal cases. The particular

issue however is whether permitting the jury to fix the penalty in such cases is a deprivation of a defendant's guaranteed constitutional right of trial by jury. As early as 1725 the jury fixed punishment under the common law. Many of the States of this country have shifted the power of imposing sentences in criminal cases from the judge to the jury and then back to the judge. Under the present Illinois Criminal Code this power is now with the trial judge and not the jury. For a proper interpretation of the jury-trial guarantee we have examined many State and Federal cases. In essence this guarantee insures to a defendant in a criminal case (1) the right to have the facts in controversy determined by 12 impartial jurors (2) that the trial be conducted in the presence and under the direction and superintendence of a judge and (3) that the verdict be unanimous. (*See, Sinopoli* v. *Chicago Railways Co.* 316 Ill. 609; *Commonwealth* v. *Loftus,* 292 Pa. 395, 141 Atl. 289; *Lindsey* v. *United States,* (D.C. cir.) 133 F.2d 368; *Patton* v. *United States,* 281 U.S. 276, 74 L. ed. 854.) We are of the opinion that the constitutional guarantee of trial by jury in criminal cases does not preclude the jury's power to fix the punishment."

No persuasive arguments have been advanced to change our opinion and we adhere to our decision in the *Kolep* case.

In conclusion we find from this record that the defendants have received a fair trial by an impartial jury; that the evidence supports their verdicts, and no prejudicial error intervened to require a new trial. The judgments of the trial court are therefore affirmed.

*Judgments affirmed.*